UNITED STATES COURT OF INTERNATIONAL TRADE

```
_____
                              :
SPECIALTY COMMODITIES INC.,   :
                              :
      Plaintiff,              :
                              :        Before: Richard K. Eaton, Judge
      v.                      :
                              :        Court No. 11-00091
UNITED STATES,                :
                              :
      Defendant.              :
_____:
```

**<u>OPINION</u>**

[Determining the tariff classification for edible seeds of the *Pinus koraiensis*.]

Dated: December 2, 2016

*J. Christopher Jensen*, Cowan, Liebowitz & Latman, P.C., of New York, NY, argued for plaintiff.  With him on the brief were *Clarence J. Erickson* and *Sara J. Herchenroder*.

*Monica P. Triana*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of New York, NY, argued for defendant.  With her on the brief were *Benjamin C. Mizer*, Principal Deputy Assistant Attorney General and *Amy M. Rubin*, Assistant Director, International Trade Field Office.  Of counsel on the brief was *Sheryl A. French*, Office of Assistant Chief Counsel, International Trade Litigation, U.S. Customs and Border Protection of New York, NY.

EATON, Judge: At issue is the proper classification of Specialty Commodities

Inc.'s ("plaintiff") merchandise, the seeds of the *Pinus koraiensis* tree.  Before the court is

plaintiff's motion for summary judgment and the cross-motion for summary judgment of the

United States on behalf of U.S. Customs and Border Protection ("the Government" or

"defendant").  *See* Mem. of Law in Supp. of Pl.'s Mot. for Summ. J. (ECF Dkt. No. 39) ("Pl.'s

Br."); Def.'s Mem. of Law in Opp'n to Pl.'s Mot. for Summ. J. & in Supp. of Cross-Mot. for

Summ. J. (ECF Dkt. No. 44) ("Def.'s Br.").  Plaintiff challenges Customs' classification of its

entries of seeds of the *Pinus koraiensis* tree under subheading 0802.90.97 of the Harmonized

Tariff Schedule of the United States ("HTSUS"),[1] providing for classification of "Other nuts,

fresh or dried, whether or not shelled or peeled: Other: Other: *Shelled*: *Other*."  Pl.'s Br. 3;

HTSUS 0802.90.97 (2009) (emphasis added).  Plaintiff asserts Customs misclassified the seeds

because they are properly classified under HTSUS subheading 0802.90.25, which provides for

classification of "Other nuts, fresh or dried, whether or not shelled or peeled: Other: *Pignolia*:

*Shelled*."  Pl.'s Br. 3; HTSUS 0802.90.25 (emphasis added).  Plaintiff seeks a reliquidation of the

merchandise under HTSUS 0802.90.25 and a refund with interest for overpayments of duties.

Pl.'s Br. 1.  The Government maintains that its classification was correct, and the seeds are

properly classifiable under HTSUS 0802.90.97.

---

[1]        All references to the HTSUS refer to the 2009 edition.  The pertinent HTSUS
subheading provides:

0802    Other nuts, fresh or dried, whether or not shelled or peeled:

| | | |
|---|---|---|
| 0802.90 | Other: | |
| | Pecans: | |
| 0802.90.10 | In shell . . . . . . . . . . . . . . kg . . . . . . . 8.8¢/kg | |
| 0802.90.15 | Shelled . . . . . . . . . . . . . . kg . . . . . .17.6¢/kg | |
| | Pignolia: | |
| 0802.90.20 | In shell . . . . . . . . . . . . . . kg . . . . . . .0.7¢/kg | |
| 0802.90.25 | Shelled . . . . . . . . . . . . . . kg . . . . . . . .1¢/kg | |
| | Other: | |
| 0802.90.81 | In shell . . . . . . . . . . . . . . kg . . . . . .1.3¢/kg | |
| | Shelled: | |
| 0802.90.94 | Kola nuts . . . . . . kg . . . . . . . . .5¢/kg | |
| 0802.90.97 | Other . . . . . . . . . kg . . . . . . . . .5¢/kg | |

The court has jurisdiction pursuant to 28 U.S.C. § 1581(a) (2006).  For the reasons

discussed below, plaintiff's motion for summary judgment is denied and defendant's cross-

motion for summary judgment is granted.  The court finds that the proper classification for the

seeds is HTSUS 0802.90.97.


## BACKGROUND

Plaintiff is a U.S. importer of raw, shelled pine nuts, the edible seeds of the *Pinus

koraiensis*, a pine tree indigenous to northeast Asia.  Joint Statement of Undisputed Facts ¶¶ 1–6

(ECF Dkt. No. 33) ("Statement of Facts").  The seeds are processed in, and exported from,

China.  Statement of Facts ¶ 4.  On June 28, 2009, and July 12, 2009, the subject merchandise

entered the United States through the Port of Minneapolis as entry numbers BHV-0004055-6 and

BHV-0004113-3.  Statement of Facts ¶¶ 3, 9.  Upon entry, the merchandise was described on

plaintiff's entry documents as "Chinese Pinenut Kernels" and classified by plaintiff under

HTSUS 0802.90.25 (i.e., "Other nuts, fresh or dried, whether or not shelled or peeled: Other:

Pignolia: Shelled."), subject to a $0.01 per kilogram duty rate.  Statement of Facts ¶¶ 4, 7, 8.

On August 19, 2009, Customs rejected plaintiff's claimed classification.  Customs'

rejection relied on Explanatory Note 08.02, which reads: "[t]he principal nuts of this heading are

almonds (sweet or bitter), hazelnuts or filberts, walnuts, chestnuts (*Castanea spp.*), pistachios,

pecans and pignolia nuts (seeds of the *Pinus pinea*)."[2]  Statement of Facts ¶ 9; *See* Explanatory

Notes to the Harmonized Commodity Description & Coding Sys., 08.02 (1st ed. 1986)

("Explanatory Note"), Def.'s Br. Ex. A, at 9 (ECF Dkt. No. 44-1).  Based on this Explanatory

---

[2]        *Pinus pinea*, also known as the Italian Stone Pine, is "a species of pine tree
indigenous to southern Europe, northern Africa and parts of the Mediterranean."  Statement of
Facts ¶ 11.

Note, and because plaintiff's invoices stated the nuts were "Chinese Pinenut Kernels," Customs

concluded the merchandise did not fit within HTSUS 0802.90.25.  Statement of Facts ¶ 9.

Specifically, Customs found that "the explanatory notes define pignolia as *Pinus pinea* [and

plaintiff's] invoice doesn't indicate this information."  Statement of Facts ¶ 9.  Customs

determined the merchandise was properly classified under HTSUS 0802.90.97, a basket

provision that carries a $0.05 per kilogram duty rate.  Statement of Facts ¶¶ 13, 15; *see* HTSUS

0802.90.97.  Thus, for Customs, only seeds of the *Pinus pinea* tree are properly classified under

HTSUS subheading 0802.90.25.  *See* Statement of Facts ¶ 9.  Customs therefore concluded that

seeds produced by the *Pinus koraiensis* species are properly classifiable as "Other" under

HTSUS subheading 0802.90.97.  Statement of Facts ¶ 15.  As a result, the entries were liquidated

under HTSUS subheading 0802.90.97 on October 30, 2009.  Statement of Facts ¶ 15.

On April 22, 2010, plaintiff timely protested Customs' liquidation of the seeds.

Statement of Facts ¶ 17.  In its protest, plaintiff insisted that they were properly classified as

"Pignolia."  Statement of Facts ¶ 17.  On October 15, 2010, Customs denied the protest in

Headquarters Ruling Letter HQ H114758, concluding the seeds were properly classified under

the basket provision, HTSUS 0802.90.97.  Statement of Facts ¶ 19 & Ex. B (ECF Dkt. No. 33-2)

("Headquarters Ruling Letter HQ H114758").  This lawsuit followed.


## STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law."  USCIT

R. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  "When both parties

move for summary judgment, the court must evaluate each motion on its own merits, resolving

all reasonable inferences against the party whose motion is under consideration." *JVC Co. of Am., Div. of U.S. JVC Corp. v. United States*, 234 F.3d 1348, 1351 (Fed. Cir. 2000).

This court employs a two-step analysis when reviewing Customs' classification determinations. First, it must ascertain "the proper meaning of the tariff provisions," a question of law reviewed de novo, and second, determine "whether merchandise falls within a particular heading," a question of fact reviewed for clear error. *LeMans Corp. v. United States*, 660 F.3d 1311, 1315 (Fed. Cir. 2011) (citing *Cummins Inc. v. United States*, 454 F.3d 1361, 1363 (Fed. Cir. 2006)). In the context of a classification action, "summary judgment is appropriate when there is no genuine dispute as to the underlying factual issue of exactly what the merchandise is." *Bausch & Lomb, Inc. v. United States*, 148 F.3d 1363, 1365 (Fed. Cir. 1998). That is, where "the nature of the merchandise is undisputed, the inquiry collapses into a question of law we review de novo." *LeMans*, 660 F.3d at 1315.

As for agency deference, "[o]n questions of law, a classification decision of Customs may be accorded a 'respect proportional to its "power to persuade."'" *Lerner N.Y., Inc. v. United States*, 37 CIT __, __, 908 F. Supp. 2d 1313, 1318 (2013), *aff'd sub nom. Victoria's Secret Direct, LLC v. United States*, 769 F.3d 1102 (Fed. Cir. 2014) (quoting *United States v. Mead Corp.*, 533 U.S. 215, 235 (2001) (citation omitted)). Further, while Customs enjoys a statutory presumption of correctness as to its factual interpretations, the Federal Circuit has "squarely held that the statutory presumption of correctness under § 2639 is irrelevant where there is no factual dispute between the parties." *Rollerblade, Inc. v. United States*, 112 F.3d 481, 483–84 (Fed. Cir. 1997); *Universal Elecs., Inc. v. United States*, 112 F.3d 488, 492–93 (Fed. Cir. 1997).

In addition, while the plaintiff "has the burden of establishing that the [G]overnment's classification is wrong," the court must determine whether Customs' "classification is correct,

both independently and in comparison with the importer's alternative." *G.G. Marck & Assocs.,*

*Inc. v. United States*, No. 08-00306, slip op. 15-62, at *8 (CIT June 17, 2015) (quoting *Jarvis*

*Clark Co. v. United States*, 733 F.2d 873, 878 (Fed. Cir. 1984)).


## DISCUSSION

### I.   LEGAL FRAMEWORK

The tariff classification of imported merchandise is governed by the "General Rules of

Interpretation" ("GRI") and the "Additional United States Rules of Interpretation" ("ARI"),

which are applied in numerical order.  *R.T. Foods, Inc. v. United States*, 757 F.3d 1349, 1353

(Fed. Cir. 2014).  Accordingly, the classification analysis begins with GRI 1, under which

"classification shall be determined according to the terms of the headings and any relative

section or chapter notes."  HTSUS GRI 1; *see R.T. Foods*, 757 F.3d at 1353 ("[A] court first

construes the language of the heading, and any section or chapter notes in question, to determine

whether the product at issue is classifiable under the heading." (internal quotation marks and

citation omitted)).  Next, GRI 6 provides that "the classification of goods in the subheadings of a

heading shall be determined according to the terms of those subheadings and any related

subheading notes and, *mutatis mutandis*, to the above rules, on the understanding that only

subheadings at the same level are comparable."  HTSUS GRI 6.

"The HTSUS is organized by headings and each of these headings has one or more

subheadings."  *Deckers Outdoor Corp. v. United States*, 714 F.3d 1363, 1366 (Fed. Cir. 2013).

Some HTSUS headings and subheadings, such as the "Pignolia" subheading proposed by

plaintiff, are *eo nomine* provisions, or those that "describe[] an article by a specific name."  *R.T.*

*Foods*, 757 F.3d at 1354; *Carl Zeiss, Inc. v. United States*, 195 F.3d 1375, 1379 (Fed. Cir. 1999).

The HTSUS also includes basket provisions, such as that under which Customs classified the

seeds, and classification into such headings or subheadings "is only appropriate if there is no

tariff category that covers the merchandise more specifically." *R.T. Foods*, 757 F.3d at 1354

(quoting *Rollerblade*, 24 CIT at 815, 116 F. Supp. 2d at 1251).

"Tariff acts are construed to carry out the intent of Congress, which is initially

determined by looking at the language of the statute itself." *Lerner*, 37 CIT at __, 908 F. Supp.

2d at 1318.  The heading and subheading language in the HTSUS, however, may have "broad

and narrow interpretations," and "the court must determine which definition best expresses the

congressional intent." *Id.* at __, 908 F. Supp. 2d at 1319; *Nissho Iwai Am. Corp. v. United

States*, 143 F.3d 1470, 1472 (Fed. Cir. 1998).  "Absent contrary legislative intent, HTSUS terms

are to be construed according to their common and commercial meanings, which are presumed to

be the same," unless a party can show a term "has a different commercial meaning that is

definite, uniform, and general throughout the trade." *Carl Zeiss*, 195 F.3d at 1379.  In construing

HTSUS headings and subheadings, the "court may rely upon its own understanding of the terms

used and may consult lexicographic and scientific authorities, dictionaries, and other reliable

information sources." *Id.*

"[T]he Explanatory Notes are regularly used by this Court to determine the intent of the

drafters with respect to the provisions of the HTSUS." *Streetsurfing LLC v. United States*, 38

CIT __, __, 11 F. Supp. 3d 1287, 1300 (2014); *see Mita Copystar Am. v. United States*, 21 F.3d

1079, 1082 (Fed. Cir. 1994).  "Although 'not legally binding,'" the Explanatory Notes to the

Harmonized Commodity Description and Coding System ("Harmonized System"), "may be

consulted for guidance and are generally indicative of the proper interpretation of a tariff

provision." *Lerner*, 37 CIT at __, 908 F. Supp. 2d at 1318–19 (quoting *Degussa Corp. v. United

States*, 508 F.3d 1044, 1047 (Fed. Cir. 2007)).  Moreover, the Harmonized System, upon which

the HTSUS is based, "is a multipurpose international product nomenclature developed by the

World Customs Organization" ("WCO"). *Nomenclature and Classification of Goods*, World

Customs Organization, http://www.wcoomd.org (last visited Nov. 9, 2016).  The Explanatory

Notes constitute the international Harmonized System's official interpretation.  Omnibus Trade

and Competitiveness Act, Pub. L. 100–418, H.R. Rep. No. 100-576, at 549 (Conf. Rep.), *as

reprinted in* 1988 U.S.C.C.A.N. 1547, 1582.  As shall be seen, at least to the six-digit level, the

Federal Circuit has found that the Explanatory Notes, accompanying each chapter of the

Harmonized System, are "'persuasive[]' and are 'generally indicative' of the proper

interpretation of the [HTSUS] tariff provision."  *R.T. Foods*, 757 F.3d at 1353 n.5 (citation

omitted).


## II.   SUMMARY JUDGMENT IS APPROPRIATE

As noted, summary judgment is appropriate in a Customs classification case when "there

is no factual dispute regarding what the merchandise is."  *Sony Elecs., Inc. v. United States*, No.

09-00043, slip op. 13-153, at *6 (CIT Dec. 23, 2013) (citing *Faus Grp., Inc. v. United States*,

581 F.3d 1369, 1372 (Fed. Cir. 2009).  In addition, "the proper meaning and scope of the

relevant provisions and a determination of the preferred heading for classification purposes, [are]

both questions of law."  *Carl Zeiss*, 195 F.3d at 1378.

Here, the parties agree that the subject merchandise is seeds of the *Pinus koraiensis*.

Statement of Facts ¶ 5.  Because "there is no factual dispute regarding what the merchandise is,"

*Sony Elecs.*, slip op. 13-153, at *5, the remaining question is "the proper meaning of . . . the

relevant tariff provision[]," which is a legal question, reviewed de novo, and appropriate for

summary judgment.  *Id.*; *see EOS of N. Am., Inc. v. United States*, 37 CIT __, __, 911 F. Supp.

2d 1311, 1317–18 (2013).

The parties also agree that the subject merchandise is properly classified under the

HTSUS subheading 0802.90 ("Other nuts, fresh or dried, whether or not shelled or peeled:

Other."). Def.'s Br. 6; *see* Pl.'s Br. 1. This subheading, however, is further divided into other

subheadings at the eight-digit level: "Pignolia" and "Other." HTSUS 0802.90. Therefore, the

dispute involves whether the subject merchandise, seeds of the *Pinus koraiensis* tree, is properly

classified under the "Pignolia" subheading or the basket provision "Other." HTSUS 0802.90.25

("Pignolia"); HTSUS 0802.90.97 ("Other").

**III.   PLAINTIFF HAS FAILED TO DEMONSTRATE THAT THE
       MEANING OF PIGNOLIA INCLUDES SEEDS OF THE *PINUS KORAIENSIS***

   **A.      Lexicographic, Dictionary, and Industry Sources**

If the HTSUS does not define a term, it is "construed according to [its] common and

commercial meanings, which are presumed to be the same." *Carl Zeiss*, 195 F.3d at 1379. To

determine this meaning, the "court may rely upon its own understanding of the terms used and

may consult lexicographic and scientific authorities, dictionaries, and other reliable information

sources." *Id.*

Plaintiff contends that all pine nuts, including the seeds of the *Pinus koraiensis*, are

commonly known as pignolia nuts. Pl.'s Br. 6. Specialty Commodities supports its claim by

citing several dictionary definitions.[3] *See* Pl.'s Br. 6–7; Decl. of J. Christopher Jensen in Supp.

of Pl.'s Mot. for Summ. J. (ECF Dkt. No. 34) ("Jensen Decl."); Jensen Decl. Ex. A (ECF Dkt.

No. 34-1) (dictionary definitions). Plaintiff points to: (1) *Webster's Third New International*

---

[3]        The court notes that plaintiff also cites to and quotes Wikipedia. Pl.'s Br. 7 & n.7.

*Dictionary*, which defines "pignolia" as "the edible seed of the nut pine"; (2) *Random House*

*Unabridged Dictionary*, which provides "pine nut 1. Also, pignolia.  the seed of any of several

pine trees, as the piñon, eaten roasted or salted or used in making [food]"; (3) *Merriam-Webster*,

states "Definition of PIGNOLI : PINE NUT"; (4) *Oxford Dictionaries*, stating "pignoli[,]

[d]efinition of *pignoli* in English: plural noun Pine nuts"; and (5) *Webster's New World College*

*Dictionary* which defines pignolia as "the edible seed of *any various nut pines also pignoli*."

Jensen Decl. Ex. A (emphasis added).  According to plaintiff, these definitions "support[ its]

position that the term refers to all pine nuts, regardless of species."  Pl.'s Br. 7.

Moreover, plaintiff seeks to demonstrate that the word pignolia has the same meaning

when used in commerce "within the nut industry."  Pl.'s Br. 7.  First, plaintiff relies on an

August 2004 article *Pine Nuts (Pignolia): Species, Products, Markets and Potential for U.S.*

*Production*.  Pl.'s Br. 7.  This article, written by an Associate Director at the University of

Missouri Center for Agroforestry and his Research Assistant, describes the international pine nut

market.  Jensen Decl. Ex. B (ECF Dkt. No. 34-2) (Leonid Sharashkin & Michael Gold, *Pine Nuts*

*(Pignolia): Species, Products, Markets and Potential for U.S. Production*, N. Nut Growers Ass'n

95th Annual Report (Aug. 2004)) ("Jensen Decl. Ex. B (Sharashkin & Gold)").  Plaintiff argues

that "[t]hroughout this published work, the authors do not distinguish between pine nuts derived

from the species *Pinus pinea* and those from other species," but rather the article uses "pine

nuts" interchangeably with "pignolia."  *See* Pl.'s Br. 7–8.  Further, according to plaintiff, the

authors address the interchangeability of pignolia nuts and pine nuts when they state "'that

consumers are usually not sophisticated enough to distinguish between nuts of different species,

therefore the nuts are usually lumped together in the commerce and referred to as 'pine nuts',

pinyon nuts, pignolia, etc.'"  Pl.'s Br. 8 (quoting Jensen Decl. Ex. B (Sharashkin & Gold)).

Plaintiff also cites two publications presented at a 1993 U.S. Department of Agriculture ("USDA") Symposium entitled *Managing Piñon-Juniper Ecosystems for Sustainability and Social Needs*. Pl.'s Br. 8. The first article, *Pine Nuts (Pinus) Imported Into the United States*, written by Elbert L. Little, Jr., a retired dendrologist[4] for the USDA Forest Service, discusses United States pine nut imports. Jensen Decl. Ex. C (ECF Dkt. No. 34-3) (Elbert L. Little, *Pine Nuts (Pinus) Imported Into the United States*) ("Jensen Decl. Ex. C (Little)"). According to plaintiff, this article uses the words pignolia and pine nuts interchangeably, and explains that all pine nut imports are referred to as pignolia by the U.S. Census Bureau data. Pl.'s Br. 8; Jensen Decl. Ex. C (Little) ("The term pignolia has been used throughout for all pine nuts imported, and scientific names have not been cited.").

Plaintiff further asserts that another article presented at the USDA symposium, *U.S. Market for Imported Pignoli Nuts*, uses pine nuts and pignolia nuts interchangeably. Jensen Decl. Ex. C. (Steven Delco et al., *U.S. Market for Imported Pignoli Nuts*) ("Jensen Decl. Ex. C (Delco et al.)"). This article states "[t]he major suppliers to the U.S. during [1989–1992] were China, Portugal, Hong Kong, and Spain. China has maintained a dominate position in supplying Pignoli nuts to the U.S. market . . . ." Jensen Decl. Ex. C (Delco et al.). Additionally, this article contains graphs and figures that, rather than referring to pine nuts generally, are labeled "US Pignoli Nut Imports (in Pounds)" and "Major Pignoli Nut Suppliers to US Market," and reflect imports of Chinese pine nuts. Jensen Decl. Ex. C. (Delco et al.).

In addition to the USDA symposium articles, plaintiff points to U.S. Census Bureau data reflecting imports of "pignolia nuts" from various countries. Pl.'s Reply Mem. in Further Supp.

---

[4]        Dendrology is "the study of trees." Dendrology, Merriam-Webster, http://www.merriam-webster.com/dictionary/dendrology.

of Pl.'s Mot. for Summ. J and in Opp. to Def.'s Cross-Mot. for Summ. J. 6 (ECF Dkt. No. 47)

("Pl.'s Reply Br."), Ex. B. (ECF Dkt. No. 47-2) (U.S. General Imps., Commodity by Country

(Dep't of Commerce Dec. 1978)) ("Pl.'s Reply Br. Ex. B. (U.S. Census Bureau Data)").  The

U.S. Census Bureau's chart, under the heading 0577840 "PIGNOLIA NUTS, SHELLED OR

NOT SHELLED, BLANCHED OR OTHERWISE PREPARED OR PRESERVED," reflects

Spain, Portugal, Iran, China, and "OTH CTY" as the "Countr[ies] of Origin" for these imports.

Pl.'s Reply Br. Ex. B. (U.S. Census Bureau Data).  From this, plaintiff concludes "that pignolia

nuts have historically been imported into the United States from these and other countries," and

are "[c]learly . . . not limited to the *Pinus pinea* species."  Pl.'s Reply Br. 6.

Plaintiff further points to websites to support its claim that under both their common and

commercial meaning, all pine nuts are pignolia nuts.  *See* Pl.'s Br. 9–10.  For example, the

USDA's website and wholesalepinenuts.com use pignolia and pine nuts interchangeably, and

even go as far as stating they are the same.[5]  *See* Pl.'s Br. 9–10.  Specifically, the USDA website

posted an article stating: "[t]he many varieties of these pine seeds come under the broad name,

'pignolias.'"  Bernice K. McGeary & Malcolm E. Smith, *Nuts, a Shell Game that Pays Off in*

*Good Eating*, http://naldc.nal.usda.gov/download/CAIN709013222/PDF.  In addition,

wholesalepinenuts.com states that "Shelled Pinoli and Shelled Pignoli are just another name for

our shelled pine nuts and no shell pine nuts."  *Wholesalepinenuts.com*,

http://www.wholesalepinenuts.com/american-nevada-shelled-pinyon-pine-nuts-no-shell-

sale.html (last visited Nov. 9, 2016).  These sources, plaintiff maintains, clearly equate pignolia

with pine nuts.  *See* Pl.'s Br. 9–10.

---

[5]        Plaintiff also cites the website thenutbox.com, stating: "Pine Nuts (Pignolia)."
*Thenutbox.com*, http://www.thenutbox.com/Pine-Nuts-Pignolia-p/318.htm (last visited Nov. 9,
2016).

In response, the Government first notes that none of the dictionary definitions offered by plaintiff specifically include its product, seeds of the *Pinus koraiensis*—the seeds at issue here. Def.'s Br. 12.  To the contrary, defendant argues, the definitions supplied by plaintiff, when read in conjunction with the sources it cites, simply indicate that all pignolia are pine nuts, but not necessarily that all pine nuts are pignolia.  Def.'s Br. 11.  In other words, the Government agrees that plaintiff's definitions are "accurate statement[s], as 'pignolia' is a type of pine nut; however, this does not support plaintiff's contention that 'pignolia' covers all species of pine nuts."  Def.'s Br. 12.

To make its case, the Government counters with lexicographic and other sources of its own that define "pignolia" more narrowly.  Def.'s Br. 8–9.  The Government points to *Encyclopedia Britannica*, *The Columbia Encyclopedia*, *Cambridge World History of Food*, and *Oxford English Dictionary* to support its argument that the definition of pignolia is not equivalent to pine nut.  Def.'s Br. Exs. C–F (ECF Dkt. No. 44-1).  The sources offered by the Government define pignolia as either the seeds of the *Pinus pinea*, and no other type of pine tree, or as the seeds of only a few particular types of pine trees, but notably not the *Pinus koraiensis*. Specifically, *Encyclopedia Britannica*, in its definition of "pinenut," states:

> The pinenuts are seeds of a considerable number of species [native] to remote and often more or less arid parts of the earth . . . nuts are borne in the axils of the cone scales.  The stone pine [of] Europe and Asia, the pinyon pines of North America, and [the] Araucarian pine of the Andean region of South America are most important.  *With the exception of the Italian stone pine seeds of which are sold as "pignolia" and exported*, pinenuts [are] largely consumed in the general regions where they are prod[uced].

Def.'s Br. Ex. C (Encyclopedia Britannica) (emphasis added).  *The Columbia Encyclopedia* provides:

> Pine nuts, or Indian nuts, were an important food for some early Native Americans and are still harvested in quantity both for food and for trading.  They are picked

> from the ground, taken from squirrel caches, or extracted by hand from the cones. Some pine stands are in danger of depletion because insufficient seeds are left for reproduction. *Pignolia nuts are the seeds of P. pinea of S Europe, where they are cultivated and much used for food.*

Def.'s Br. Ex. E. (The Columbia Encyclopedia) (emphasis added). The *Cambridge World History of Food* states:

> Also called pignoli, pignolia, pignons, piñon nuts, and Indian nuts, these ivory-toned seeds come from the pinecones of several trees of the genus *Pinus* and rank alongside macadamias and pistachios as the most expensive nuts on the market. The European term for pine nuts is *pignolia, indicating that they come from the Italian stone pine, which grows in Italy, Iberia, and North Africa.*

Def.'s Br. Ex. F. (Cambridge World History of Food) (emphasis added). The *Oxford English Dictionary* defines "pignolia" as "[t]he edible seed of the cones of certain pines, esp. the stone pine, *Pinus pinea*, of southern Europe; a pine nut." Def.'s Br. Ex. D. (Oxford English Dictionary).

As to the industry sources offered by plaintiff, the Government counters that plaintiff overemphasizes the purported interchangeability of "pignolia" and "pine nut" in these articles. Def.'s Br. 12. With regard to the publications presented at the USDA symposium, the Government asserts that "even if *Pinus koraiensis* were viewed by a governmental agency as 'pignolia' in the past," this "does not mean that any such determination was made by Customs, or that it was correct." Def.'s Br. 14. Further, according to defendant, nothing in the record indicated: (1) that the pine nuts discussed during the symposium were "imported from China, . . . produced in or indigenous to China," (2) that "the data was pulled only from product[s] classified as 'pignolia' under 0802.90.25, HTSUS, " or (3) "that the product being imported was *Pinus koraiensis*." Def.'s Br. 13–14. Therefore, for the Government, because it is unclear what types of nuts were referenced in the USDA articles, plaintiff cannot say these articles demonstrate that all pine nuts, including seeds of the *Pinus koraiensis*, are also referred to as pignolia nuts.

Respecting the reference to the Sharashkin and Gold article from the University of

Missouri, the Government asserts "pignolia" is only referenced once, and is simply used in

passing to discuss unsophisticated consumers.  Def.'s Br. 12 ("The term 'pignolia' appears in the

text of the article exactly one time.  Contrary to plaintiff's assertion, the article uses the generic

term 'pine nut' throughout; that is, the article discusses various *pine nuts* and their markets as

well as *pine nut* production." (emphasis in original)).  The Government further argues that the

most the article might be cited for, is that consumers may confuse the various seeds—not that it

establishes plaintiff's product is commonly and commercially known as pignolia.  Def.'s Br. 12.

That is, for defendant, the article does not demonstrate that pignolia has an established common

or commercial meaning encompassing all pine nuts.  *See* Def.'s Br. 12.

The Government offers its own industry sources, which it claims demonstrate that *Pinus

koraiensis* is not commonly or commercially included within the meaning of pignolia.  Def.'s Br.

9–10.  For example, *The Book of Edible Nuts* states "the most common designation for the [pine]

nuts in Europe is 'pignolia,' a term which refers to pine nuts of the Italian stone pine, *Pinus

pinea*, grown for the most part in Spain, Portugal, Italy, and North Africa."  Def.'s Br. Ex. G

(Frederic Rosengarten, Jr., The Book of Edible Nuts 309 (1984)) ("Def.'s Br. Ex. G

(Rosengarten)").  Additionally, "in the United States nut trade, 'pine nuts' may refer to the

European pignolia, the North American piñon or the Chinese pine nut."  *Id.* at 311.  The source

further provides that *Pinus koraiensis* has in recent years become "a commercially competitive

nut," but is "[c]heaper than the more delicate European pignolias."  *Id.* at 315; Def.'s Br. 10.

Defendant also points to *The Deluxe Food Lover's Companion* which describes "pine

nut" as a seed

> from several varieties of pine trees. . . .  Pine nuts grow in China, Italy, Mexico,
> North Africa and the southwestern United States.  There are two main varieties.

> Both have a thin shell with an ivory-colored nutmeat that averages about ½ inch in
> length.  The Mediterranean or Italian Pine Nut is from the stone pine [*i.e.* pignolia].
> It's torpedo-shaped, has a light, delicate flavor and is the more expensive of the
> two.  The stronger-flavored Chinese pine nut is shaped like a squat triangle.  Its
> pungent pine flavor can easily overpower some foods.

Def.'s Br. Ex. H (The Deluxe Food Lover's Companion); Def.'s Br. 10.  For Customs,

these sources support its contention that all species of pine nuts are not pignolia nuts.

The court finds that the various definitions and industry sources offered fail to establish

that seeds of the *Pinus koraiensis* necessarily are included within the common or commercial

meanings of pignolia.  *See* Pl.'s Br. 8–10; Def.'s Br. 8–11.  While plaintiff's dictionary

definitions do tend to indicate that the word pignolia does encompass pine nuts other than the

seeds of the *Pinus pinea*, Customs' sources do not.  Specifically, plaintiff's sources define

pignolia generally, as "the seed of any several pine trees," whereas Customs' sources provide

that "[p]ignolia nuts are the seeds of *P. pinea* of S Europe."  Jensen Decl. Ex. A; Def.'s Br. Exs.

C–F.  Importantly, no cited source equates pignolia with plaintiff's actual product, the seeds of

the *Pinus koraiensis*.  *See Sigma-Tau Healthscience, Inc. v. United States*, No. 16-1125, at *11

(Fed. Cir. Sept. 26, 2016) ("Whether a [good] is commonly referred to as [a term provided in the

HTSUS] may be pertinent, but only if there is a consensus as to the use of that terminology.");

*see also Deckers Outdoor Corp.*, 714 F.3d at 1369 ("Because there are competing dictionary

definitions of the term 'slip-on'—and many of those definitions are not limited to shoes—the

Trade Court correctly declined to limit the term 'footwear of the slip-on type' to shoes.").  As a

result, it cannot be said that the word pignolia has a common meaning that embraces all pine

nuts, or the seeds of the *Pinus koraiensis* in particular.

In like manner, the sources cited fail to establish that the commercial meaning of pignolia

includes seeds of the *Pinus koraiensis*.  Plaintiff first cites an article from the University of

Missouri Center for Agroforestry stating that consumers cannot "distinguish between nuts of different species," and as a result "the nuts are usually lumped together in the commerce and referred to as 'pine nuts', pinyon nuts, pignolia, etc." Jensen Decl. Ex. B. (Sharashkin & Gold). This article, however, fails to cite any support for this assertion. To the court, the article's unsupported assertions are not helpful in determining pignolia's commercial meaning.

The court also finds the USDA symposium articles[6] and U.S. Census Bureau data, which plaintiff asserts use pignolia and pine nuts interchangeably, do not clarify the common and commercial meaning of pignolia. Notably, Little's USDA article acknowledges that scientific names have not been cited, however, the classification based on scientific names is the precise issue before the court. In addition, the court notes that the Delco et al. article shows that Chinese pine nuts were imported during 1988 to 1992, however, it also provides that "[t]here are regional varieties of the pine nut throughout the world" and that "the Spanish and Italian pine nut [are] a different variety from the Chinese nut." Jensen Decl. Ex. C (Delco et al.).

The U.S. Census Bureau data presented by plaintiff, reflecting imports from foreign countries of pine nuts as pignolia nuts, is also not persuasive in establishing the common and commercial meaning.[7] This is because the data collected reflected how importers had self-

---

[6]        It is worth noting that the USDA articles plaintiff presented, as if they were another agency's interpretation, do not necessarily reflect the USDA's understanding of the term pignolia. Importantly, the USDA included a disclaimer in the symposium materials, stating that "[t]he views expressed in each paper are those of the author and not necessarily those of the USDA Forest Service." *Managing Piñon-Juniper Ecosystems for Sustainability and Social Needs*, U.S. Dep't of Agriculture (Apr. 26–30 1993).

[7]        Specifically, the chart provides:

Table 2. Schedule A Commodity by Country of Origin, Customs, F.a.s., and C.i.f. Values—Continued

classified their entries, not the conscious decisions of Customs.  Thus, the U.S. Census Bureau

data does not reflect a decision on the part of Customs to classify all pine nuts as "Pignolia," but

rather represents actions made "expeditiously and without examination or Customs officer

review" to accept importers proposed tariff provision.[8]  *See Motorola, Inc. v. United States*, 436

F.3d 1357, 1367 (Fed. Cir. 2006) (citation omitted).  That is, all the U.S. Census Bureau data

---

|  . . .         |                                      |
| 0577840        | PIGNOLIA NUTS, SHELLED OR NOT SHELLED . . . |
|                |                                      |
| SPAIN          | . . .                                |
| PORTUGAL       | . . .                                |
| IRAN           | . . .                                |
| CHINA P        | . . .                                |
| OTH CTY        | . . .                                |
| TOTAL          | . . .                                |

Pl.'s Reply Br. Ex. B. (U.S. Census Bureau Data).

[8]      It is important to note that plaintiff makes no argument that, because Customs has
previously liquidated entries of seeds other than seeds of the *Pinus pinea* under the HTSUS
subheading "Pignolia," its nuts should likewise be classified under this subheading.  In other
words, plaintiff does not argue that it is entitled to prevail on the theory that Customs' previous
actions of liquidating entries of *Pinus* seeds constitutes prior "treatment," and that Customs'
decision not to liquidate the seeds of the *Pinus koraiensis* under this subheading is a departure
from such treatment.  The Federal Circuit has held that "the admission of entries 'expeditiously
and without examination or Customs officer review' does not constitute 'treatment' within the
meaning of section 1625(c)(2)."  *Motorola, Inc. v. United States*, 436 F.3d 1357, 1367 (Fed. Cir.
2006).  As a result, Customs' previous liquidations of seeds other than the *Pinus pinea* under
subheading 0802.90.25 is not "treatment" resulting in a change entitling plaintiff to relief.  *Cf.
Cal. Indus. Prods., Inc. v. United States*, 436 F.3d 1341, 1351 (Fed. Cir. 2006) ("Turning to the
merits, section 1625(c)(2) mandates that Customs follow notice and comment procedures before
issuing an 'interpretive ruling or decision which would . . . have the effect of modifying the
treatment previously accorded by the Customs Service to substantially identical transactions.'"
(quoting 19 U.S.C. § 1625(c)(2)).  In any event, since this argument was not made, it is waived.
*United States v. Great Am. Ins. Co. of N.Y.*, 738 F.3d 1320, 1328 (Fed. Cir. 2013) ("It is well
established that arguments that are not appropriately developed in a party's briefing may be
deemed waived.").

reflects is that the importers self-classified the seeds of the *Pinus koraiensis* under "Pignolia,"

not that Customs made a reasoned decision that this was the appropriate subheading.

For its part, defendant points to *The Deluxe Food Lover's Companion* and *The Book of

Edible Nuts*, both indicating that pignolia nuts are seeds of the *Pinus pinea*.  Def.'s Br. Ex. G

(Rosengarten); Def.'s Br. Ex. H (The Deluxe Food Lover's Companion).  For instance, *The

Deluxe Food Lover's Companion* provides "Pine nuts grow in China, Italy, Mexico, North Africa

and southwestern United States.  There are two main varieties. . . .  The Mediterranean or Italian

Pine Nut is from the stone pine [*i.e. pignolia*].  The stronger-flavored Chinese pine nut is shaped

like a squat triangle."  Def.'s Br. Ex. H  (The Deluxe Food Lover's Companion).  *The Book of

Edible Nuts* also distinguishes pine nuts based on species and geographical location.  Def.'s Br.

Ex. G (Rosengarten).

A look at sources not cited by the parties sheds some light on the common meaning of

"Pignolia."  Pinenut.com, run by a domestic organization "advocat[ing] and consult[ing] on

sustainable forestry approaches" distinguishes domestic pine nuts from Korean pine nuts and

Italian pine nuts.  Know your pine nuts!, Pinenut.com, http://www.pinenut.com/pine-nuts/pinon-

pinyon-nuts.shtml (last visited Nov. 9, 2016).  Discussing different species of pine nuts, the

website states: "ITALIAN Stone pine (Pinus pinea) [m]any tout the Pine nuts from Italy

(pignolia, pinolia), however[,] that species *Pinus pinea* is very common in the European market

and grown throughout the Meditrainian [(sic)] region.  The processing factors and distribution

factors of *Pinus pinea* end up making it rather bland."  *Id.*  This website shows that at least one

U.S. organization, with an interest in pine nuts, distinguishes the Italian pignolia nut from other

pine nuts, arguing there is a difference in quality.  *Id.*  ("Siberian Nuts are much smaller . . . [t]he

nut meat looks nothing like the nut meats of New Mexican or Nevada Pine nuts, [and]. . . they

are not as 'round and flat' as pinons.").

In sum, for the court, the sources fail to demonstrate that there is a commercial meaning

for the word pignola that covers plaintiff's product.  Therefore, the court finds that plaintiff has

failed to establish the common or commercial meaning of pignola to include pine nuts of all

species, and in particular that plaintiff has failed to demonstrate that its seeds of the *Pinus*

*koraiensis*, are encompassed within the meaning of the word.


**B.      Customs' New York Ruling Letters Did Not Establish "Pignolia's" Meaning**

Plaintiff next asserts that Customs established pignolia's meaning in two New York

Customs Ruling letters classifying oil and vinegar sets.  Pl.'s Br. 10.  The first Customs Ruling

Letter states: "[o]ne bottle contains 'Rosemary & Pignoli Infused Oil' a yellow liquid which is

stated to be canola oil, rosemary, pine nuts (or pignoli) and black peppercorns.  It has visible

rosemary sprigs with some pine nuts and peppercorns floating within."  Jensen Decl. Ex. F

(*Tariff classification of Oil and Vinegar from China*, NY F86911 (Customs & Border Prot.

May 31, 2000)).  Another Customs Ruling letter on oil and vinegar sets states: "'rosemary and

pignolia infused oil' . . . [i]t has visible rosemary sprigs and some pine nuts, or pignoli, and black

peppercorns floating within."  Jensen Decl. Ex. F (*The tariff classification of an Oil and Vinegar*

*Set from China*, NYG89892 (Customs & Border Prot. May 7, 2001)).  Plaintiff argues that these

ruling letters establish that Customs acknowledged that "'pignolia' refer[s] to pine nuts

generally, including those of the Asian origin," and thus that all pine nuts are pignolia nuts.  Pl.'s

Br. 10; *Lonza, Inc. v. United States*, 46 F.3d 1098, 1106 (Fed. Cir. 1995) (per curiam) ("The

common meaning of a tariff term, once established, remains controlling until a subsequent

change in statute compels a revised construction of the term's meaning.").

The Government responds that these ruling letters are not persuasive in this case because agency determinations "are not binding on this court," and more importantly that it is "unclear based on the facts available what types of pine nut was included" in the oil and vinegar sets.[9] Def.'s Br. 14; *cf. Warner-Lambert Co. v. United States*, 425 F.3d 1381, 1384 (Fed. Cir. 2005).

The court finds that the two previous ruling letters are sufficiently unrelated to the subheading at issue in this case, so as to be unhelpful in establishing a meaning for pignolia. Here, the classification of the pine trees' seeds could not be said to have been on the minds of the authors of the letters classifying oil and vinegar sets.  In addition, Customs' regulations provide that "[e]ach ruling letter setting forth the proper classification of an article under the provisions of the [HTSUS]" is applicable "only with respect to transactions involving articles identical to the sample submitted with the ruling request or to articles whose description is identical to the description set forth in the ruling letter." 19 C.F.R. § 177.9(b)(2).  The Federal Circuit has interpreted 19 C.F.R. § 177.9(c) to permit a ruling letter to be "binding only on the party to whom it is issued, and may be revoked or cancelled at any time."[10]  *Jewelpak Corp. v. United*

---

[9]        In response, plaintiff asserts that because the oil and vinegar sets were from China, it is extremely likely that the pine nuts at issue in these ruling letters were also Chinese pine nuts.  Pl.'s Reply Br. 7–8.

[10]        The regulation provides that:

> Except when public notice and comment procedures apply under [section] 177.12, a ruling letter is subject to modification or revocation by [Customs] without notice to any person other than the person to whom the ruling letter was addressed. Accordingly, no other person should rely on the ruling letter or assume that the principles of that ruling will be applied in connection with any transaction other than the one described in the letter.

19 C.F.R. § 177.9(c).

*States*, 297 F.3d 1326, 1335 (Fed. Cir. 2002).

Indeed, pursuant to the regulations, these two ruling letters apply only to Customs'

interpretations with respect to those oil and vinegar sets, not Customs' interpretation of pignolia.

19 C.F.R. §§ 177.9(b)(2), (c).  This being the case, the two ruling letters do not establish that

Customs previously used the term pignolia interchangeably with pine nut.  Last, Customs'

rulings are entitled to deference only to the degree of their power to persuade, and this "degree of

deference" turns on "the thoroughness evident in the classification ruling; the validity of the

reasoning that led to the classification; . . . the formality with which the particular ruling was

established; and other factors that supply a 'power to persuade.'"  *Warner-Lambert Co. v. United*

*States*, 407 F.3d 1207, 1209 (Fed. Cir. 2005) (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134,

140 (1944)).  As a result, because the ruling letters pertained to a different provision of the

HTSUS and do not show that Customs has "thoroughly considered [the] particular

classification," they are unpersuasive in establishing pignolia's meaning.  *Sony Elecs.*, slip op.

13-153, at *11; *see* 19 C.F.R. § 177.9(b)(2).


### C.     There Was Not an Established Meaning for "Pignolia" Under the Tariff Schedules of the United States

Next, plaintiff argues that the meaning of pignolia was established under the Tariff

Schedule of the United States ("TSUS")[11] and its predecessor tariff schedules, and this meaning

---

[11]         The TSUS was created by the Customs Simplification Act of 1954, which

directed the Tariff Commission to compile a revision of customs laws classifying
imports for tariff purposes.  The Commission submitted the *Tariff Classification
Study* to Congress and the President on November 15, 1960; a supplemental report
was submitted in January, 1962.  The Commission's report, as amended, became
the Tariff Classification Act of 1962.  This act implemented the TSUS, which took
effect on August 31, 1963.

*Lonza*, 46 F.3d at 1101.  The TSUS included the term "Pignolia."  Edible Nuts and Fruits, Animal and Vegetable Products, Tariff Schedules of the United States Annotated sch. 1 part 9 sec. 145.52 (1987).  Under the TSUS of 1987, the last version before the implementation of the HTSUS, the pertinent subheadings read:

| Item | . . . | Articles | Units of Quantity | Rates of Duty |
|------|-------|----------|-------------------|---------------|
| | | Other edible nuts, shelled or not shelled, blanched, or otherwise prepared or preserved: | | |
| | . . . | | | |
| | | Shelled, blanched or preserved: | | |
| | | Almonds: | | |
| 145.40 | | Shelled | Lb. | 16.5¢ per lb. |
| 145.41 | | Other | Lb. | 18.5¢ per lb. |
| 142.42 | | Brazil nuts | Lb. | Free |
| 145.44 | | Cashews | Lb. | Free |
| 145.46 | | Filberts | Lb. | 8¢ per lb. |
| 145.48 | | Peanuts 1/ | … | 3¢ per lb. |
| | | Peanut butter | Lb. | |
| | | Other: | | |
| | | Not shelled | Lb. | |
| | | Other | Lb. | |
| 145.50 | | Pecans | Lb. | 10¢ per lb. |
| 145.52 | | Pignolia | Lb. | 1 ¢ per lb. 2/ |
| 145.53 | | Pistache | Lb. | 1 ¢ per lb. |
| 145.54 | | Walnuts: | | |
| | | Pickled, immature walnuts | Lb. | 5¢ per lb. |
| | | Other | Lb. | 15¢ per lb. |
| | | Other edible nuts: | | |
| | | Shelled or blanched . . . | | 5¢ per lb |
| | | Macadamia nuts | Lb. | [blank] |
| | | Other | Lb. | [blank] |

Edible Nuts and Fruits, Animal and Vegetable Products, Tariff Schedules of the United States Annotated sch. 1, part 9, p.1-54 (1987).

carried forward into the current HTSUS,[12] because there is no evidence Congress intended to change this meaning in the HTSUS.  Pl.'s Br. 12–13.

First, plaintiff cites the 1921 Summaries of Trade and Tariff Information ("SOTI") Report[13] as evidence that, from an early date, pignolia was "a term generally applicable to nuts of pine trees, regardless of species or place of origin."  Pl.'s Br. 11.  The 1921 SOTI Report provides an explanation of the Tariff Act of 1922, a predecessor of the TSUS.  *See* General Notes on Para., Summary of Tariff Information 757 (U.S. Tariff Comm'n 1921).  Under the heading "Pignolia Nuts," the 1921 SOTI Report provides:

> *Description, uses, and production.—Pignolia or pine nuts are the seeds of a considerable number of both American and foreign pines*.  The nuts are marketed

---

[12]     The pertinent HTSUS subheading provides:

0802     Other nuts, fresh or dried, whether or not shelled or peeled:

| | | |
|---|---|---|
| 0802.90 | Other: | |
| | Pecans: | |
| 0802.90.10 | In shell . . . . . . . . . . . . . . kg . . . . . . . 8.8¢/kg | |
| 0802.90.15 | Shelled . . . . . . . . . . . . . kg . . . . . 17.6¢/kg | |
| | Pignolia: | |
| 0802.90.20 | In shell . . . . . . . . . . . . . . kg . . . . . . .0.7¢/kg | |
| 0802.90.25 | Shelled . . . . . . . . . . . . . kg . . . . . . . .1¢/kg | |
| | Other: | |
| 0802.90.81 | In shell . . . . . . . . . . . . . . kg . . . . . . .1.3¢/kg | |
| | Shelled: | |
| 0802.90.94 | Kola nuts . . . . . . kg . . . . . . . . .5¢/kg | |
| 0802.90.97 | Other . . . . . . . . . kg . . . . . . . . .5¢/kg | |

[13]     The SOTI Reports are written by a "professional staff of commodity specialists, economists, lawyers, statisticians, and accountants," and "reflect the most recent developments affecting U.S. foreign trade in the commodities included."  Foreword, Summary of Tariff Information (U.S. Tariff Comm'n 1968).

> without the shell and in appearance somewhat resemble puffed rice. The kernels are very rich and form an important article of food in some countries. A few species of American pines yield edible nuts, but the domestic product is commercially not important. Southern Europe, Chile, and Mexico produce quantities of the nut.

> *Imports.*—Some pignolia nuts are imported; statistics of imports are, however, lacking.

Pignolia Nuts, Summary of Tariff Information 757 (U.S. Tariff Comm'n 1921) (emphasis added). For plaintiff, "[s]uch language indicates that the term 'pignolia' was understood [by the Tariff Commission] to be synonymous with 'pine nuts.'" Pl.'s Br. 12. Further, plaintiff asserts that the definition in the 1921 SOTI Report should be used to interpret "pignolia" in the Tariff Act of 1922. Pl.'s Br. 12. The Tariff Act of 1922 states: "Cream or Brazil nuts, 1 cent per pound; filberts, not shelled, 2½ cents per pound; shelled. 5 cents per pound; *pignolia nuts, 1 cent per pound*; pistache nuts, 1 cent per pound." Tariff Act of 1922, ch. 356, 42 Stat. 858, 895, *repealed by* Tariff Act of 1930, ch. 497, 46 Stat. 590 (emphasis added); Pl.'s Br. 12. According to plaintiff, the statements concerning pignolia nuts in the 1921 SOTI Report are persuasive as to the meaning of "pignolia" in the Tariff Act of 1922. Pl.'s Br. 12.

Next, plaintiff contends that the meaning of pignolia, accepted in the Tariff Act of 1922, carried forward to "the relevant provision of [the] Tariff Act of 1930, and then to section 145.52 of the [TSUS]." Pl.'s Br. 12 (citations omitted). In other words, plaintiff's argument is that the 1921 SOTI Report establishes that the meaning of pignolia nuts includes all species of pine nuts in the Tariff Act of 1922, and that this meaning carried over to the Tariff Act of 1930 and, by extension, to the TSUS. Pl.'s Br. 12–13 ("Thus, under the TSUS, the legal definition of the tariff term 'pignolia' remained as it did under the SOTI."). Finally, because, for plaintiff, pignolia's meaning was established under the TSUS, it argues that the court should continue to apply this meaning when interpreting the HTSUS, unless there is "'clear evidence' of congressional intent

to the contrary."  Pl.'s Br. 13 (quoting *Intercontinental Marble Corp. v. United States*, 27 CIT

654, 663, 264 F. Supp. 2d 1306, 1316 (2003)).

In response, the Government argues that neither 1921 SOTI Report nor the Tariff Act of

1922 establish a meaning for pignolia nuts that carried over to the HTSUS.  Def.'s Br. 15–16.

This is because, neither the Tariff Act of 1930, nor the 1946 revision, use the word pignolia.[14]

Def.'s Br. 17.  According to defendant, even if the 1921 SOTI Report sheds light on the 1922

Tariff Act, because of the gap in the word's use in subsequent tariff schedules, the 1921 SOTI

Report is not persuasive as to the court's interpretation of the term under the HTSUS.  Thus,

defendant argues that under the Tariff Act of 1930 and its revisions, all pine nuts were classified

under a general category "Other," because there was no pignolia classification.  Def.'s Br. 17.

For defendant, this omission is important.  Based on the absence of the word pignolia in the later

---

[14]     Specifically, the Tariff Act of 1930 provides:

Par. 757.  Cream or Brazil nuts, not shelled, 1½ cents per pound; shelled, 4½ cents per pound; filberts, not shelled, 5 cents per pound; shelled, 10 cents per pound; any of the foregoing, if blanched, shall be subject to the same rate of duty as it not blanched.
. . .
Par. 761.  Edible nuts, not specially provided for, not shelled, 2½ cents per pound; shelled, 5 cents per pound.

Tariff Act of 1930, Pub. L. 71-361, 46 Stat. 590 (1930).  In addition, the pertinent paragraphs in the 1946 revisions to the Tariff Act of 1930 remained unchanged:

Par. 757.  Cream or Brazil nuts, not shelled, 1½ cents per pound; shelled, 4½ cents per pound; filberts, not shelled, 5 cents per pound; shelled, 10 cents per pound; any of the foregoing, if blanched, shall be subject to the same rate of duty as if not blanched.
. . .
Par. 761.  Edible nuts, not specially provided for, not shelled, 2 ½ cents per pound; shelled, 5 cents per pound.

Def.'s Br. Ex. M (Revision of the Tariff Act of 1930, U.S. Tariff Comm'n 63 para. 757, 761 (June 1946)).

Acts, it argues, it is impossible to say that the description found in the 1921 SOTI Report was carried over from the Tariff Act of 1922 to the TSUS when the word was not mentioned in the intervening Tariff Act or its revisions.  *See* Def.'s Br. 17.

Importantly, the Government maintains that, if the court were to consider a SOTI Report, it should turn to the more recent 1968 SOTI Report, which "provides more specific information as to which foreign pine nuts would be considered 'pignolia'" under the TSUS.  Def.'s Br. 16. The 1968 SOTI Report states

> [t]he *pignolia nut* is gathered from certain species of pine trees.  The nuts imported from Italy, Portugal, and Spain are slender nuts, about ½ inch long.  These nuts enter almost entirely in the shelled form and are sold, after roasting and slating, for eating out of hand.  They are also used as an ingredient in certain Mediterranean-style food dishes.
>
> The domestic *pine nut* is short and stubby in contrast to the long, slender appearance of the imported nut. . . .  The domestic pine nuts are not directly competitive with the imported nuts, as they differ in taste, shape, and the form in which marketed.

Brazil, Cashew and Certain Other Nuts, Summaries of Trade and Tariff Information 264 (U.S. Tariff Comm'n 1968) (emphasis added).  Defendant argues that this language distinguishes pignolia nuts from other pine nuts because it provides that pignolia nuts are gathered from "certain" pine trees in Europe, whereas pine nuts, a more general term, refers to domestic nuts from the United States.  Def.'s Br. 17.  Moreover, the Government also notes that the listed geographic locations do not include China.  *See* Def.'s Br. 16–17; Brazil, Cashew and Certain Other Nuts, Summaries of Trade and Tariff Information 264 (U.S. Tariff Comm'n 1968).

A SOTI Report can indeed help to establish the meaning of words found in earlier acts.[15] Pl.'s Br. 11 ("Although not evidence of legislative intent, the SOTI is illustrative because it 'may be employed by the court as a vehicle for ascertaining administrative practice or particular meanings of tariff terms.'" (quoting *Abitibi Price Sales Corp. v. United States*, 13 CIT 787, 796–97 (1989)).  Here, however, the 1921 SOTI Report does not establish the meaning plaintiff asserts under the TSUS.  *See Lonza*, 46 F.3d at 1106.  Although the 1921 SOTI Report indicates that "Pignolia" or pine nuts meant "the seeds of a considerable number of both American and foreign pine" under the Tariff Act of 1922, the absence of the word pignolia in the Tariff Act of 1930 and subsequent revisions, suggests that this meaning was not transferred to the TSUS. Pignolia Nuts, Summary of Tariff Information 757 (U.S. Tariff Comm'n 1921).

Moreover, the court agrees with the Government that the 1968 SOTI Report is more persuasive when interpreting a term under the TSUS.  As defendant points out, the later 1968 SOTI Report more specifically identifies distinctions between pignolia nuts and pine nuts.  Thus, "[t]he *pignolia nut* is gathered from certain species of pine trees.  The nuts imported from Italy, Portugal, and Spain . . .  The domestic pine nut is short and stubby in contrast to the long, slender appearance of the imported nut."  Brazil, Cashew and Certain Other Nuts, Summaries of Trade and Tariff Information 264 (U.S. Tariff Comm'n 1968).  The court finds that the 1968 SOTI Report is persuasive as to the meaning of the term pignolia under the TSUS, at least to the extent that it confirms the Government's point that all pine nuts are not pignolia.

---

[15]     The Federal Circuit concluded that the SOTI Reports are persuasive when interpreting the TSUS.  *Rollerblade*, 112 F.3d at 485 n.2 ("Although not controlling, the Summaries are nonetheless instructive on the meaning of a tariff term."); *United States v. Standard Surplus Sales, Inc.*, 667 F.2d 1011, 1015 & n.4 (C.C.P.A. 1981) ("Though not controlling, the *Summaries* have been employed as aids in ascertaining the meaning of a tariff term.").

The conclusion here must be, then, that the meaning of the word pignolia was not established in the TSUS so as to include the seeds of the *Pinus koraiensis*.  Because it concludes that the plaintiff's asserted meaning was not established in the TSUS, the court does not address plaintiff's remaining arguments regarding the absence of contrary congressional intent.  *Cf. Intercontinental Marble*, 381 F.3d at 1173.

### D.   Consistent with the Relevant Explanatory Note, the Meaning of Pignolia Does Not Include Seeds of the *Pinus koraiensis*

The Government argues that, based on the Explanatory Notes, the proper interpretation of the term "Pignolia" is seeds of the *Pinus pinea*.  *See* Def.'s Br. 5–6.

While not legally binding, Explanatory Notes, at least to the six-digit level, are persuasive authority that "clarify the scope of HTSUS subheadings and . . . offer guidance in interpreting" the HTSUS.  *Streetsurfing*, 38 CIT at __, 11 F. Supp. 3d at 1294 (quoting *Mita Copystar Am.*, 21 F.3d at 1082).  The Federal Circuit has repeatedly "credited the unambiguous text of relevant [E]xplanatory [N]otes" to determine the meaning of a term in the HTSUS "absent persuasive reasons to disregard it."  *Drygel, Inc. v. United States*, 541 F.3d 1129, 1134 (Fed. Cir. 2008); *see LeMans*, 660 F.3d at 1321 ("Use of Explanatory Notes in this manner to interpret a heading of the HTSUS is entirely proper."); *StoreWALL, LLC v. United States*, 644 F.3d 1358, 1363 (Fed. Cir. 2011); *Agfa Corp. v. United States*, 520 F.3d 1326, 1330 (Fed. Cir. 2008) (holding that the Explanatory Notes "directly address the issue under consideration," and that "while the Explanatory Notes are not binding, they are persuasive authority.").  It is important to note, however, that the cases citing the persuasiveness of the Explanatory Notes have largely been those construing a subheading's terms to the six-digit level.

The HTSUS was implemented in accordance to the International Convention on the

Harmonized Commodity Description and Coding System ("the Convention"), an international

agreement[16] that "requires that signatories, in effectuating the [Harmonized System] in their

respective domestic laws, not alter the scope of a [Harmonized System] heading."[17] *Victoria's*

*Secret Direct, LLC v. United States*, 37 CIT __, __, 908 F. Supp. 2d 1332, 1348 (2013), *aff'd*,

769 F.3d 1102 (Fed. Cir. 2014).   Thus while the Harmonized System classified merchandise only

to the six-digit level, signatories to the agreement could add further to the subheadings (i.e., the

eight-digit level) but could not alter the scope of a heading.   *Id.* ("[M]odifications of the scope of

---

[16]        "The World Customs Organization (WCO), established in 1952 as the Customs
Co-operation Council (CCC) is an independent intergovernmental body whose mission is to
enhance the effectiveness and efficiency of Customs administrations. . . ."  Nomenclature and
Classification of Goods, World Customs Organization, http://www.wcoomd.org/en/about-
us/what-is-the-wco.aspx (last visited Nov. 9, 2016).

> The system is used by more than 200 countries and economies as a basis for their
> Customs tariffs and for the collection of international trade statistics. Over 98% of
> the merchandise in international trade is classified in terms of the [Harmonized
> System]. . . .   The Harmonized System is governed by 'The International
> Convention on the Harmonized Commodity Description and Coding System.' The
> official interpretation of the [Harmonized System] is given in the Explanatory
> Notes (5 volumes in English and French) published by the WCO.

Nomenclature and Classification of Goods, World Customs Organization,
http://www.wcoomd.org/en/topics/nomenclature/overview/what-is-the-harmonized-system.aspx
(last visited Nov. 9, 2016).

[17]

> In preparing the draft version of the HTSUS for congressional consideration, the
> U.S. International Trade Commission ("ITC") explicitly recognized the obligation
> of the United States, as a signatory of the Convention on the Harmonized System,
> to maintain consistency with the HS nomenclature for the headings that were to be
> shared by all signatories to the Convention, *i.e.*, the headings in chapters 1 through
> 97.

*Victoria's Secret Direct, LLC v. United States*, 37 CIT __, __, 908 F. Supp. 2d 1332, 1348
(2013), *aff'd*, 769 F.3d 1102 (Fed. Cir. 2014).

the various parts of the Harmonized System are not permitted; however, further detailed

subdivisions for classifying goods (such as for tariff, quota, or statistical purposes) are permitted

so long as they are added and coded at a level beyond the six-digit numerical code provided in

the Harmonized System." (citation omitted)).  In other words, the contracting parties have agreed

to conform their respective tariff schedules in accordance with the Harmonized System, although

they may provide further specific detail.

    This commitment is codified in 19 U.S.C. § 3005(a),[18] by which Congress recognizes its

"obligation to maintain consistency with the Harmonized System."  *Id.* at __, 908 F. Supp. 2d

1348–49.  As a result, this Court has held that "in light of the recognized obligation to maintain

HTSUS headings consistently with the [Harmonized System]," and "absent legislative intent" to

differ from the Harmonized System, the court will not presume that Congress enacted a tariff

heading with a different scope than that provided by the drafters of the Harmonized System.  *Id.*

at __, 908 F. Supp. 2d at 1349.  Thus, while at the eight-digit level the Explanatory Notes cannot

---

[18]     The statute provides:

(a) In general

The Commission shall keep the [HTSUS] under continuous review and periodically,
at such time as amendments to the Convention are recommended by the Customs
Cooperation Council for adoption, and as other circumstances warrant, shall
recommend to the President such modifications in the [HTSUS] as the Commission
considers necessary or appropriate—

(1) to conform the [HTSUS] with amendments made to the Convention;
(2) to promote the uniform application of the Convention and particularly the Annex
thereto;
(3) to ensure that the [HTSUS] is kept up-to-date in light of changes in technology
or in patterns of international trade;
(4) to alleviate unnecessary administrative burdens; and
(5) to make technical rectifications.

19 U.S.C. § 3005(a).

be said to reflect the intent of the drafters of the HTSUS, they can certainly be said to reflect the intent of the Harmonized System drafters.

This is particularly true in a case like this where the First Edition of the Explanatory Notes was available to those who drafted the eight-digit subheadings at issue.  In 1986, the WCO issued the First Edition of the Explanatory Notes, which provided interpretive guidance for terms in the proposed Harmonized System.  Introduction, Explanatory Notes (1 ed. 1986). Specifically, the 1986 First Edition Explanatory Notes included the term pignolia and limited it to seeds of the *Pinus pinea*.  That is, in 1986, the First Edition Explanatory Note to the Harmonized System stated "pignolia nuts (seeds of the *Pinus pinea*)."  This language remained unchanged in the finalized 2007 Explanatory Note and its subsequent revisions.  Explanatory Note 08.02 (2007).

The court therefore finds the Explanatory Note to be informative as to the meaning of the subheading's words.  *See Pima W., Inc. v. United States*, 20 CIT 110, 113 n.2, 915 F. Supp. 399, 402 n.2 (1996) ("The eight-digit level of classification is subsidiary to, not an expansion of, the six- and four-digit levels.  If the Explanatory Notes offer guidance that a product should be excluded from a four-digit heading or six-digit subheading, one can properly infer that the product is excluded from the eight-digit subheading."); *NEC Elecs., Inc. v. United States*, 144 F.3d 788, 791 (Fed. Cir. 1998) ("We cannot accept NEC's argument that this Explanatory Note is only pertinent to the meaning of the six-digit subheading . . . but not the eight-digit subheading.").

The Explanatory Note to the Harmonized System states that: "[t]he principal nuts of this heading are almonds (sweet or bitter), hazelnuts or filberts, walnuts, chestnuts (*Castanea spp.*),

pistachios, pecans and pignolia nuts (seeds of the *Pinus pinea*)."[19]  Thus, at least to the six-digit

level, the Explanatory Note limits the words pignolia nuts to the seeds of the *Pinus pinea*.  In

other words, the Explanatory Note excludes plaintiff's seeds to the six-digit level and "one can

---

[19]      The Explanatory Note, in full, provides:

08.02- OTHER NUTS, FRESH OR DRIED, WHETHER OR NOT SHELLED OR
PEELED.

|   | - | Almonds: |
|---|---|---|
| 0802.11 | -- | In Shell |
| 0802.12 | -- | Shelled |
|   | - | Hazelnuts or filberts (*Corylus spp.*): |
| 0802.21 | -- | In shell |
| 0802.22 | -- | Shelled |
|   | - | Walnuts: |
| 0802.31 | -- | In shell |
| 0802.32 | -- | Shelled |
| 0802.40 | - | Chestnuts (*Castanea spp.*) |
| 0802.50 | - | Pistachios |
| 0802.90 | - | Other |

The principal nuts of this heading are almonds (sweet or bitter), hazelnuts or
filberts, walnuts, chestnuts (*Castanea spp.*), pistachios, pecans and pignolia nuts (seeds of
the *Pinus pinea*).

This heading also covers areca (betel) nuts used chiefly as a masticatory, and cola
(Kola) nuts used both as a masticatory and as a base in the manufacture of beverages.

The heading does not include:
(a) Empty walnut or almond hills (heading 14.04).
(b) Ground-nuts (heading 12.02), roasted ground-nuts or peanut butter (heading 20.08).
(c) Horse chestnuts (*Aesculus hippocastanum*) (heading 23.08).

Explanatory Notes to the Harmonized System 08.02 (1986).

properly infer that the product is excluded from the eight-digit subheading."[20]  *Pima*, 20 CIT at

113 n.2, 915 F. Supp. at 402 n.2.

Moreover, the drafters of the eight-digit subheadings had available to them not only the

First Edition Explanatory Notes, but also the 1968 SOTI Report when they did their work.  The

1968 SOTI Report, as has been noted, is instructive as to the meaning of a term under the TSUS,

and suggests that the term pignolia is limited to seeds of the Italian Stone pine (seeds of the

*Pinus pinea*).  *Rollerblade*, 112 F.3d at 485 n.2; Brazil, Cashew and Certain Other Nuts,

Summaries of Trade and Tariff Information 264 (U.S. Tariff Comm'n 1968) ("[t]he *pignolia nut*

is gathered from certain species of pine trees.  The nuts imported from Italy, Portugal, and Spain

are slender nuts about ½ inch long.").  This "pignolia" subheading remained a part of the TSUS

until its last version in 1987.[21]

---

[20]     It is worth noting that the Federal Circuit's holding in *Sigma-Tau Healthscience*, is not inapposite.  In that case, the disputed heading's Explanatory Note's definition of vitamin under heading 29.36 directly conflicted with the HTSUS's eight-digit country specific subheading 2936.29.50.20.  *Sigma-Tau Healthscience*, No. 16-1125, at *14.  The Federal Circuit concluded that, because "[t]his portion of the definition of 'vitamin' in [the Explanatory Note] contradicts the express inclusion of vitamin D under the HTSUS heading," and therefore "must be disregarded."  *Id.*  That is, the drafters of the HTSUS expressly included, at the eight-digit country specific level, a classification incompatible with the definition provided in the Explanatory Notes.  Here, however, the meaning suggested by the Explanatory Note does not conflict with the HTSUS's eight-digit country specific heading, but instead is persuasive in clarifying the meaning of undefined tariff terms.

[21]     The progression of the TSUS subheading to the applicable HTSUS subheading is also significant.  The TSUS, under the heading "Other edible nuts, shelled or not shelled, blanched, or otherwise prepared or preserved" provides for: almonds, Brazil nuts, cashews, filberts, peanuts, pecans, pignolia, pistache, walnuts, and macadamia nuts.  Edible Nuts and Fruits, Animal and Vegetable Products, Tariff Schedules of the United States Annotated sch. 1, part 9, p.1-54 (1987).  In comparison, the first version of the HTSUS subheading 0802 provides for: almonds, hazelnuts or filberts, walnuts, chestnuts, pistachios, and pignolia nuts.  HTSUS 0802 (1989).  The applicable 2009 HTSUS remains substantially the same as the 1989 version.  HTSUS 0802 (2009).

Therefore, in 1988 the drafters of the HTSUS had before them the TSUS, the 1968 SOTI

Report, and the 1986 First Edition of the Explanatory Notes.[22]  These sources all tend to define

pignolia narrowly, as seeds of the *Pinus pinea*.  Moreover, when drafting the HTSUS, the

international agreement reached at the Convention, as well as domestic law, prevented the

drafters from changing or departing from the headings and subheadings in the Harmonized

System when further specifying the scope of the classifications at the eight-digit level.

*Victoria's Secret Direct*, 37 CIT at __, 908 F. Supp. 2d at 1348.

Based on foregoing, the court holds that term "Pignolia" in HTSUS subheading

0802.90.25 does not include "seeds of the *Pinus koraiensis*."


**E.      This Case is Distinguishable from *Intercontinental Marble***

In *Intercontinental Marble*, the parties disagreed as to the proper interpretation of the

---

[22]      After the Harmonized System and Explanatory Notes, Congress passed the
Omnibus Trade and Competitiveness Act to incorporate the international agreement
requirements into U.S. law.  Omnibus Trade and Competitiveness Act, Pub. L. 100–418, H.R.
Rep. No. 100-576, at 549 (Conf. Rep.), *as reprinted in* 1988 U.S.C.C.A.N. 1547, 1582.  The
legislative history to the Omnibus Trade and Competitiveness Act provides:

Status of Explanatory Notes

The Explanatory Notes constitute the Customs Cooperation Council's
official interpretation of the Harmonized System.  They provide a commentary on
the scope of each heading of the Harmonized System and are thus useful in
ascertaining the classification of merchandise under the system.
The Explanatory Notes were drafted subsequent to the preparation of the
Harmonized System nomenclature itself, and will be modified from time to time by
the CCC's Harmonized System Committee.  Although generally indicative of
proper interpretation of the various provisions of the Convention, the Explanatory
Notes, like other similar publications of the Council, are not legally binding on
contracting parties to the Convention.  Thus, while they should be consulted for
guidance, the Explanatory Notes should not be treated as dispositive.

Omnibus Trade and Competitiveness Act, Pub. L. 100–418, H.R. Rep. No. 100-576, at 549
(Conf. Rep.), *as reprinted in* 1988 U.S.C.C.A.N. 1547, 1582.

term "marble" in HTSUS 6802. *See Intercontinental Marble*, 27 CIT at 658, 264 F. Supp. 2d at

1312. This Court, as well as the Court of Appeals, held that "marble" had an "established"

meaning under the TSUS. *See id.* at 661, 264 F. Supp. 2d at 1314. Therefore, this Court

concluded, because there was already an established meaning, the contradictory Explanatory

Note was unpersuasive. *Id.* at 668, 264 F. Supp. 2d at 1320. Plaintiff urges the court to find that

this case is analogous to *Intercontinental Marble*. Pl.'s Br. 16–18. In other words, plaintiff

argues that the court should disregard the Explanatory Note because it conflicts with pignolia's

established meaning.

        This case, however, is distinguishable from *Intercontinental Marble*. There, the

Explanatory Note differed from an established meaning of the term. Here, by contrast, plaintiff

failed to demonstrate an established meaning for "Pignolia" including its product, the seeds of

the *Pinus koraiensis*. Accordingly, the Explanatory Note does "not contradict the common

commercial meaning . . . but instead clarifies the scope of the term." *StoreWALL*, 644 F.3d at

1363.

        Finally, "[i]t is the court's independent duty to arrive at 'the *correct* result, by whatever

procedure is best suited to the case at hand.'" *Lerner*, 37 CIT at __, 908 F. Supp. 2d at 1318

(quoting *Jarvis Clark*, 733 F.2d at 878). After reviewing dictionary definitions, industry articles,

SOTI Reports, the Explanatory Notes, and the HTSUS's history, the court is persuaded that the

HTSUS 0802.90.25 subheading "Pignolia" is limited to "seeds of the *Pinus pinea*" as indicated

by the Explanatory Note 08.02. Therefore, the subject entries, seeds of the *Pinus koraiensis*,

were properly classified under HTSUS 0802.90.97 for "Other nuts, fresh or dried, whether or not

shelled or peeled: Other: Other: Shelled: Other."

## CONCLUSION

For the reasons stated above, plaintiff's motion for summary judgment is DENIED, and defendant's cross–motion for summary judgment is GRANTED.  Judgment will be entered accordingly.

Dated:          December 2, 2016
                New York, New York

\s\ Richard K. Eaton

_____
          Richard K. Eaton, Judge